[No. 28355. Department One. July 31, 1941.]

AMELIA A. ENGEL *et al., Respondents,* v. INTERSTATE
TRANSIT COMPANY, *Defendant,* J. KELLEHER
*et al., Appellants.*[1]

[1]Reported in 115 P. (2d) 681.

*Snively & Bounds,* for appellants.

*Short & Short* and *F. A. Kern,* for respondents.

BLAKE, J.—Plaintiffs brought this action to recover damages for personal injuries sustained by Mrs. Engel while riding in an automobile owned and driven by defendant Gierke, who, at the time, was in the employ of defendants Kelleher and Gehlen. Her injuries were the result of a collision between the Gierke car and a transport truck owned by defendant Interstate Transit Company. The collision occurred two or three miles from Cle Elum, on the road to Ellensburg. The cause was tried to the court, which found that Mrs. Engel's injuries were "solely, wholly and proximately due and caused by the negligence of . . . defendants J. Kelleher and Lawrence J. Gehlen and Melvin Gierke . . ." A judgment was accordingly entered against those defendants, from which they have appealed.

While it is urged that the evidence was insufficient to justify a finding of negligence on the part of Gierke, the principal question raised concerns the liability of Kelleher and Gehlen under the doctrine of *respondeat superior.* They take the position that there was no relationship recognized by law between Mrs. Engel, themselves, and Gierke through which they can be held for the latter's negligence.

In order to meet this question, it is necessary to relate in considerable detail a chain of eventualities antecedent to the collision which explains Mrs. Engel's presence in Gierke's car at the time of the collision.

Kelleher and Gehlen, as copartners, were operating

a garage and service station in Ellensburg. Gierke was manager of the service station. A. E. Snyder and wife owned a car which they customarily had serviced at Kelleher and Gehlen's. January 21, 1939, Mrs. Snyder (who, by the way, is a sister of Mrs. Engel's) left the car there for an oil change and grease job. Folsom, the employee who did the work, changed the oil filter although Mrs. Snyder had not specifically ordered that to be done. In doing this, he simply disconnected the tubes leading to and from the motor, and, after resetting the filter, connected them again. That evening (January 21st), Mrs. Snyder got the car and drove to her home some twelve miles from Ellensburg. Early the next morning, the Snyders, with their young son, drove to the Engels' home, which is three or four miles from Ellensburg. Mr. and Mrs. Engel joined them, and the five started for Renton to visit a brother of Mr. Snyder's.

Shortly after they got over the summit of Snoqualmie Pass, a knock developed in the motor. They coasted down to Camp Mason, where they found that a bearing had burnt out because of the leakage of oil from the tube leading down from the motor to the filter. Upon learning that it would take several hours to repair the car, Mrs. Snyder called up Gehlen at Ellensburg and told him of their plight. Of their conversation and what he was prompted to do as a result of it, Gehlen testified as follows:

"Q. And what did Mrs. Snyder tell you on that occasion? A. Mrs. Snyder called me from Camp Mason, I believe, about nine thirty or ten in the morning, and told me *that she and a party* were broken down over there due to the loss of oil in the motor of the car; that it had been serviced the day previously at our station, and she thought the oil filter had been left loose and the oil had been lost because of defective workmanship in tightening a nut, and they changed the filter, the cartridge on the oil filter. . . . Then

I called Mr. Gierke's home; I believe he was at his house; I don't recall now for sure whether he was at the house or at the station—to verify that the car had been in there, that we had done some work on it, and he told me that we had, and he also said that he would leave in a short time with his—I believe it was his aunt, Mrs. Birr, Mrs. Carl Birr, for Seattle, so I told him to stop at Camp Mason and see that *they were taken care of, and do anything he could to help them out. Then, as I recall, I called Mrs. Snyder back and told her Mr. Gierke was coming and that he would take care of her."* (Italics ours.)

When Gierke reached Camp Mason, on his way to Seattle, he found only Snyder there, the others having gone on to Renton. Upon examining the car, he found that the tube from the motor to the filter had broken. As to the cause of this break, he testified at the trial as follows:

"Q. . . . Now, then, knowing that there had been a new filter put on this car at the service station of which you were the manager, and knowing that it was necessary in order to put on that filter to disconnect this tube from the old filter and then connect it up with the new filter, and knowing there was a break in this tube the next day in going from Ellensburg to Camp Mason, as a mechanic of many years' experience, what, in your opinion, was the cause of this break in the tube? And also taking into consideration that you saw the very tube that had this break in it when you went over to Camp Mason to look into this proposition. A. Well, it could have been caused by vibration had it been kinked, and if the workman had have noticed it at the time, if he had noticed the leak when he checked it, why, no doubt he would have put on a new hose connection. Sometimes a leak doesn't show up for a time afterwards. Q. Well, then, knowing what you do about this entire proposition, is it your opinion that this break in the tube was caused from a kink it received there at the service station? MR. BOUNDS: If he can answer that. A. *That is why I answered to Mr. Snyder on my arrival at Camp Mason that it was*

*caused by a kink.* Q. And is it your answer now? A. Well, I would still say the same so far as my knowledge goes." (Italics ours.)

After examining the car, Gierke told Snyder "To tell them to go ahead and repair the car and he would okeh the bill. . . ." (He did, in fact, pay for the repairs and was reimbursed by Kelleher and Gehlen.) Gierke then went on to Seattle, taking Snyder as far as Renton. He promised to be back at Renton by three o'clock and take the party to Camp Mason. Before he arrived, however, they had started for Camp Mason in the car of Snyder's brother. Before they had reached there, Gierke overtook them, and they transferred to his car. When they got to Camp Mason, they learned that work on the Snyder car would not be completed for two or three hours. Snyder and Engel decided to wait at Camp Mason until the car was repaired. Upon Gierke's invitation, Mrs. Engel and Mrs. Snyder and her son got in his car, and they started for Ellensburg. Gierke was driving. His aunt was in the front seat. The others were in the back seat, Mrs. Engel on the right, Mrs. Snyder on the left, with the little boy between them.

The trip as far as Cle Elum was uneventful. Gierke drove through the town "at about twenty-five miles an hour." As they were leaving the outskirts of Cle Elum, he "stepped on the accelerator and the car seemed to swerve a little bit." The road "appeared dry," however, and he proceeded at a speed estimated by himself at thirty-five miles—by Mrs. Engel at fifty. In fact, the pavement was covered with a sheet of ice from a point half a mile outside of Cle Elum to the point where the collision occurred. At about the time Gierke felt his car swerve, a car had skidded on the ice at a point two or three miles away and had come to rest crosswise of the pavement. The transport truck, go-

ing toward Ellensburg, could not get by and pulled up "as far off on the shoulder as it could safely drive."

Gierke observed the marker lights of the truck when he was half a mile away, but he could not tell whether it was moving or standing. When he was a hundred and fifty yards from it, he saw a man waving a flashlight. He then realized that the truck was standing still, and attempted to stop—but it was too late. His car sideswiped the left rear corner of the truck. He says that, at the moment of impact, he had reduced his speed to five or ten miles an hour. We do not think his testimony on this point is at all convincing, for the body of his car was ripped open from the door post to the rear end. We do not see how such havoc could have been wrought had the car been moving even at ten miles an hour. (The impact and violence of a collision may be considered in determining the rate of speed of a car. *Gayson v. Daugherty*, 190 Wash. 133, 66 P. (2d) 1148.)

Speaking of the accident two days later, "he said it sure was slick that night, and he said, well, he guessed he was going a little bit too fast." He, of course, denies saying this. Whether he did or not, we think, as did the trial court, that, in view of the condition of the road, he was going too fast. He knew, or should have known, that the pavement was icy. He said it appeared dry, and he evidently regulated his speed on that assumption. We are satisfied that, upon his own testimony, the court was warranted in finding that he was guilty of negligence. Immediately after the accident, Gierke took Mrs. Engel to the Cle Elum hospital and paid for the emergency treatment administered to her there.

While the trial court did not find that the breaking of the oil tube was due to the negligence of Folsom, we think the evidence warrants such a finding, and we

shall discuss the question of liability from that view point. Gehlen assumed responsibility on that assumption, sent Gierke with power to investigate and, verifying the assumption, to act accordingly, to "see that they were taken care of, and do anything he could to help them out."

What Gierke said after examining the Snyder car at Camp Mason and his whole course of conduct from then until he took Mrs. Engel to the hospital at Cle Elum, convinces us that he was of the opinion that the oil tube broke because there was a kink in it, due to Folsom's negligence. In fact, that is the only reasonable inference that can be drawn from the sequence of events as developed by the evidence.

Folsom's negligence is, of course, important only as it forms the basis of the liability of the appellants. That established, the liability of all the appellants follows as a necessary corollary, for, unless protected by the host-guest statute (Rem. Rev. Stat., Vol. 7A, § 6360-121 [P. C. § 2696-879]), Gierke is liable for the injuries sustained by Mrs. Engel. That Kelleher and Gehlen are also liable, is equally clear, for Gierke was their expressly authorized agent to do exactly what he was doing—transporting Mrs. Snyder and *her party*.

Appellants argue that, since Mrs. Engel was a guest of the Snyders, while riding in their car, she was likewise a guest or, at most, a licensee of Gierke's while riding in his car; that there was no privity of contract between her and appellants upon which they could be charged with legal responsibility except for wilful and wanton negligence on the part of Gierke.

As we view the evidence, the relationship between Mrs. Engel and appellants does not rest in contract. While Gehlen did agree to transport Mrs. Snyder and her party, his agreement arose out of what he conceived, and what we hold, to be his legal responsibility

for such damages as might proximately result from the breakdown of the Snyder car. Obviously, the transportation of the Snyders and their guests to and from their destination during the period their car was out of commission, was an element of such damages. Mrs. Engel, therefore, was not a mere licensee while riding in Gierke's car. Nor was she his guest. She was a passenger in his car from necessity. While she was not a paying passenger, the appellants, in carrying her, were but discharging their obligation to underwrite the cost of transportation of the Snyder party. What was said in the recent case of *Scholz v. Leuer,* 7 Wn. (2d) 76, 109 P. (2d) 294, is peculiarly applicable here:

"When the court is called upon to decide whether or not the statute applies to a certain factual situation, the problem, after all, is not primarily to classify or definitely identify the relationship between the operator and the occupant, but to determine whether or not the occupant was an invited guest or licensee within the purview of the statute. For the purposes of the instant case, the meaning of the words 'invited guest or licensee' can best be ascertained by considering them in connection with the phrase which immediately follows in the statute, that is, 'without payment for such transportation.' The qualifying phrase limits the scope of 'invited guest or licensee' by indicating plainly that gratuitous carriage only is intended. If there is payment for the transportation, the statute does not apply, and this does not mean that payment must necessarily be made in money. It is sufficient if the presence of the occupant directly compensates the operator or owner in a substantial and material or business sense, as distinguished from mere social benefit or nominal or incidental contribution to expenses."

Appellants contend that Mrs. Engel was guilty of contributory negligence. We find nothing in the evidence to sustain the contention. True, she did not protest Gierke's manner of driving. Indeed, there was

no occasion for her to do so. The road "appeared dry." There is nothing to indicate that she was conscious of the swerve of the car when Gierke "stepped on the accelerator" as they left Cle Elum. Had the road been dry, as it appeared, Gierke's speed of itself would not have amounted to negligence, for it was, according to his own and Mrs. Engel's testimony, within the legal limit.

Appellants assign error upon denial of their motions to make more definite and certain, to strike, and to elect.

Since the cause was tried to the court, we fail to see what prejudice the appellants could have suffered by denial of their motions to strike and make more definite and certain even though there was some merit to them—which we doubt. The other motion was to require respondents to elect as to the theory upon which they were proceeding—host-guest, joint adventure, passenger for hire, and so forth—and by which they were seeking to fasten liability on appellants. In the light of our quotation from *Scholz v. Leuer, supra,* this motion does not require discussion. The court properly denied it.

Judgment affirmed.

MILLARD, MAIN, STEINERT, and DRIVER, JJ., concur.